George LOCKEBY *v.* MASSEY PULPWOOD, INC.

CA 90-409                                    812 S.W.2d 700

Court of Appeals of Arkansas
Division I
Opinions delivered July 3, 1991
[Rehearing denied August 21, 1991.]

*Henry, Cox & MacPhee*, by: *Bruce A. MacPhee*, for appellant.

*Laser, Sharp, Mayes, Wilson, Bufford & Watts, P.A.*, by: *Ralph R. Wilson*, for appellee.

MELVIN MAYFIELD, Judge. This is an appeal from a decision of the Workers' Compensation Commission. The administrative law judge found that the appellant was permanently and totally disabled as a result of a gradual work-related injury to his back. The Commission reversed and dismissed the claim on the basis that it was not work-related. The appellant claims the Commission's decision is contrary to the law and evidence. We agree.

The appellant testified by deposition that he is a 61-year-old man who left school after the fourth grade and worked in the logging industry all his working life. He said that when he was 12 years old he began working with his dad driving a team of mules and skidding logs. For the last 20 years, he worked for appellee driving a service truck and a log skidder. He said it took him only thirty minutes to an hour a day to service the equipment and fill the trucks with gasoline, and the rest of the time, 10-12 hours a day, five days a week, he was operating the log skidder. Appellant described the log skidder as a 518 Caterpillar with winch controls. He said his job was to drive to an area where trees had been cut down, pull the cable out of the winch (which for the last couple of years, had been hard to pull) and hook up six logs. Once the logs are hooked up, the skidder pulls them to the truck where another machine picks them up and stacks them on the truck. Appellant said riding the skidder was very rough, going over stumps and ditches, whipping the driver backward and forward, with the skidder seat, which was steel with a short back, constantly hitting him low in the center of his back.

According to appellant, on weekends he rested and went to church. He said if he did anything at all on weekends he would go into the woods to repair his employer's equipment. Appellant said he has no hobbies, does not hunt or fish, and the only thing he does around the house is mow the lawn on a riding mower. Appellant testified that before his back surgery, he had never been ill in his life, had never been in a hospital, had never been in an automobile accident or had trouble with his back or neck, and had never filed a workers' compensation claim.

Appellant could not relate a specific injury to his back or just when it started to bother him. At first he thought he might have bumped it, but it kept getting worse. Finally he went to see his family doctor, Dr. Phillip L. White, in Murphreesboro, who eventually referred him to Dr. James Arthur, a neurosurgeon in Hot Springs.

Dr. Arthur testified by deposition that he first examined appellant on January 27, 1988, and ordered a lumbar CT scan and myelogram. He reviewed the results of those tests and diagnosed appellant as having degenerative and osteoarthritic changes involving the facets at virtually every level, most signifi-

cantly at L3-4 where a significant stenosis was seen and at L4-5 where a very severe stenosis was suspected related to disc bulging, lateral facet hypertrophy and spurring of the facets as well as thickening of the longitudinal ligaments. Dr. Arthur testified he thought that the degeneration in appellant's spine had been going on for some time, and could have been going on as long as ten years. He was then asked what was the most common cause of degeneration and he said:

> Repeated trauma as well as a breakdown in supporting structure such as ligaments; a breakdown in joint function in the form of loss of synovial fluid in the joint that allows the bones instead of being lubricated and no friction being present, to rub together and form calcification; a general thickening of ligaments and shortening of ligaments and thinning of discs in the back; and production of calcium spurs.

When questioned as to the cause of appellant's condition and whether or not it was a function of age, Dr. Arthur stated:

> The narrowing in his back was due to a certain extent to the arthritis in these facet joints on the side, that's true; and that is partly at least a result of the aging process. But it was also due to a significant amount of bulging of the disc at the L5 level which would be more traumatic in other words than the facet arthritis was. In addition, the ligament on the back was very thick, which is not a result of the aging process but rather is something that we see in men that work very hard during their life, do a lot of lifting and pulling and take a lot of trauma to their back. So there were a couple of things about this narrowing that weren't due to the arthritic process of aging, although some of the narrowing I'm sure is due to that as well.

When questioned as to whether an individual could suffer from the condition without any trauma whatsoever, even if he had a sedentary job, Dr. Arthur said the appellant's case was interesting from the standpoint of "why he has this," and explained:

> I haven't ever treated a doctor that had this or a lawyer or an accountant or anyone who does a sedentary-type job. Those people are very susceptible to getting acute ruptured

disc because of what I said. They're sedentary during the week and they go out on the weekend and do something. On the other hand, the man that carries the 100-pound sack of cement or feed or picks up a cross tie and does it for 20, 30, 40 years, a man that operates — in this case — a log skidder, which is very rough, one of the roughest machines you can operate, he's getting a repeated trauma to his back. That's the man that'll develop lumbar canal stenosis from the bony changes and the ligament hypertrophy and the bulging disc. He also had arthritis in his spine which might have contributed somewhat to this condition but certainly all these other things were a result, I believe, of his job.

Dr. Arthur performed surgery on appellant's back and testified he expected appellant's healing period to end approximately July 1, 1988. He estimated appellant would have a 25% disability rating to the body as a whole as a result of his residual decreased range of motion and pain.

The deposition of Dr. Thomas M. Fletcher, a Little Rock neurosurgeon, who examined appellant at the request of the employer's insurance carrier, was introduced into evidence. He related that appellant gave him a history of gradual onset of burning back pain with no specific incident of trauma. He said appellant is a heavy man, weighing about 230 pounds, with a surgical scar in his lower back and restriction of motion. He testified that from X-ray studies he determined that appellant's difficulty was spinal stenosis, which is the narrowing of the spinal canal diameter due to thickening of the bone. In association with this, he had a disc protrusion at L4-5. Dr. Fletcher said the thickening is caused by wear and tear, thickening and bending due to arthritis and takes several years to develop. When asked whether the cause was appellant's weight, Dr. Fletcher said there were several factors involved including weight, posture, work activity, and family history. The following question and answer then occurred:

Q   Insofar as the relationship of the problems you observed and which are described in your report, can you state to any kind of medical certainty or degree or probability that they were related to his work activities?

A   Well, I don't specifically relate it to a specific incident

of trauma. I think that repeated trauma and activity over a long period , it can certainly be related to that. I mean, for instance, in working a log skidder, for instance.

When asked on cross-examination by appellant's counsel if the history of driving a log skidder 10, 12, 14 hours a day, five days a week for 20 years would contribute to appellant's disease process, Dr. Fletcher answered, "I would say that it may contribute, and probably did contribute." Asked about the jarring and the seat hitting appellant in the back, Dr. Fletcher answered, "Yes, sir. I think that that type of activity is more likely to produce. It doesn't produce it in all people, but it can aggravate it." Dr. Fletcher also testified, "I would say that the—that the work activity would be as important as the age factor." Dr. Fletcher was asked by the employer's attorney:

Q And you're not testifying that if this man hadn't worked on a log skidder in his life, if he had gone into some other occupation, he wouldn't have the problems that he is having today, are you?

A No, sir. I am not saying that.

Q Okay.

A I think that it occurs in people with other types of physical activity and even lighter forms of activity. But I stated that I thought that that type of work was more strenuous and therefore more likely to contribute to it.

Then when questioned again by appellant's attorney:

Q Can you say with a reasonable degree of medical certainty that the disc bulging or protruding is work related in this case, given the history of skidder operation?

A I would—it would be my opinion that it would be work related. The disc protrusion.

The medical records included in the transcript show that appellant first consulted Dr. White complaining of back pain on August 16, 1986. Dr. Arthur's hospital discharge summary of appellant relates that he first saw appellant on January 27, 1988; that he had been referred by Dr. White; that he was admitted to the hospital for surgical intervention; that he had an L4, 5

laminotomy and foraminotomy bilaterally on January 28, 1988; and that he was discharged on February 1, 1988. In a letter dated March 28, 1988, written to Silvey Companies (which apparently is the employer's insurance agent or carrier), Dr. White stated:

> I strongly disagree with your determination that Mr. Lockeby's back problem is not work related. I drove a log skidder before I went to medical school, and the mechanic's involved, etc., will cause back problems in the form of strain/bulging discs, etc. In addition, these machines are very rough to ride, have no shock absorbers other than in the seat, and generally will eventually cause and/or aggravate degenerative spine changes.
>
> Any of the activities involved in this gentleman's daily work routine could have caused his ruptured disc. Please reconsider this case. I will be happy to talk with you about this and/or explain my reasons for feeling that this is a workers' compensation case.

On the above evidence the administrative law judge held that the appellant had "more than adequately established" that he had sustained an injury of gradual onset out of and during the course and scope of his employment; that he was permanently and totally disabled; and that his healing period ended on June 30, 1988. On appeal the Commission reversed, with one commissioner dissenting. The majority opinion, signed by the two commissioners who agreed, concluded as follows:

> In summary, the medical testimony is that Lockeby's work might or might not have caused the injury. Although it is possible that the employment activities were responsible, there are other possible explanations, and we are not allowed to speculate as to what precipitated the medical disc protrusion.

We believe that the above summary by the Commission reveals three conclusions that are not supported by the evidence and the law.

First, the Commission finds that the medical testimony only opines that appellant's work might or might not have caused his injury. We do not think that this is a correct evaluation of the medical testimony. We have already set out portions of testimony

from the three doctors who testified, in which they express the opinion that the disabling condition of the appellant's back was work-related.

Dr. Arthur, a neurosurgeon who did a lumbar laminectomy on appellant, said the narrowing in his back "was due to a certain extent to the arthritis in these facet joints on the side . . . and that is partly at least a result of the aging process. But it was also due to a significant amount of bulging of the disc at the L5 level which would be more traumatic in other words than the facet arthritis was." Dr. Arthur also said that appellant's arthritis "might have contributed somewhat to this condition but certainly all these other things were a result, I believe, of his job."

Dr. Fletcher, a neurosurgeon who examined appellant at the request of the appellee's insurance carrier, was asked if he could say "with a reasonable degree of medical certainty that the disc bulging or protruding is work-related in this case, given the history of skidder operation, " and the doctor's answer was "it would be my opinion that it would be work-related."

Dr. White, appellant's family doctor, wrote the insurance carrier's representative and said, "I strongly disagree with your determination that Mr. Lockeby's back problem is not work-related."

■■ Thus, the Commission's first conclusion that the medical testimony is that appellant's work *might or might not* have caused his injury is not supported by the record. Each doctor testified that in his opinion the disabling condition of appellant's back *was* work-related.

Second, the Commission's summary states that while "it is possible" that appellant's employment activities were responsible for his back condition, there were "other possible" explanations. Here, we think the Commission erred in its application of the law. It is not necessary that employment activities be the *sole* cause of a worker's injury in order to receive compensation benefits. It is enough if there is "a substantially contributory casual connection between the injury and the business in which the employer employs the claimant." *American Red Cross* v. *Wilson,* 257 Ark. 647, 649, 519 S.W.2d 60 (1975). *See also McGregor & Pickett* v. *Arrington,* 206 Ark. 921, 175 S.W.2d 210 (1943). But the

Commission's real problem here, we think, is its failure to accept the proposition that an accidental injury may result from repeated trauma upon the worker's body over an extended period of time. This is the problem that the third member of the Commission spoke of, in her dissent, when she said "the majority could deny benefits only by abandoning the long-standing recognition of gradual onset injuries."

■ This has been a long-standing rule in Arkansas. In *Batesville White Lime Company v. Bell,* 212 Ark. 23, 205 S.W.2d 31 (1947), the court said:

> [T]here is much authority for a holding that an injury, not necessarily the result of one impact alone, but caused by a continuation of irritation upon some part of the body by foreign substances may properly be said to be accidental.

212 Ark. at 26. In that case the medical evidence was that inhalation of dust over a twenty-three year period had aggravated the employee's heart condition. The Commission found that there was no trauma; therefore, there was no accidental injury. On appeal to circuit court, the Commission's denial of compensation was reversed. That action affirmed by the Arkansas Supreme Court, "even though," the opinion stated, "the evidence did not show the exact instant at which the disability of appellee could be said to have occurred . . . ."

In *Bryant Stave & Heading Company v. White,* 227 Ark. 147, 296 S.W. 2d 436 (1956), the employee was engaged in his usual job of loading stave bolts when he noticed a pain in his right side, leg and back. The next morning he could "hardly get out of bed." His problem was diagnosed as an aggravation of a preexisting back condition, and the Commission awarded compensation. In affirming, the Arkansas Supreme Court reviewed its prior cases, and many other authorities, and concluded:

> Notwithstanding anything we may have said in prior cases, we hold that an accidental injury arises out of employment when the required exertion producing the injury is too great for the person undertaking the work, whatever the degree of exertion or the condition of his health, provided the exertion is either the sole or a contributing cause of the injury.

227 Ark. at 155. *See also Tri State Insurance Company* v. *Mutual Liability Insurance Company,* 254 Ark. 944, 497 S.W.2d 39 (1973). And in *St. Vincent Infirmary* v. *Carpenter,* 268 Ark. 951, 597 S.W.2d 126 (Ark. App. 1980), we said:

> The Arkansas case law has long upheld the compensability of gradual injuries which arise out of and in the course of employment. In *W. Stanhouse & Sons, Inc.* v. *Simms,* 224 Ark. 86, 272 S.W.2d 68 (1954), the Supreme Court said:
>
>> We have long adhered to the rule that an accidental injury may stem not only from a specific incident or a single impact, but also may result by a continuation of irritation upon some part of the body. — Neither do we require the injured workman to make inescapable proof that said accidental injury occurred on a date certain. A reasonable definite time is all that is required.

268 Ark. at 955

We believe the Commission's second conclusion "although it is possible that the employment activities were responsible, there are other possible explanations" demonstrates a failure to apply the law which we have just discussed.

Finally, the third conclusion in the Commission's summary is that "we are not allowed to speculate as to what precipitated the medical disc protrusion." Although the word "medical" may be a typographical error, the answer to the statement is that no speculation is required. When deciding appeals from the Arkansas Workers' Compensation Commission, we must view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission and affirm that decision if it is supported by substantial evidence. *Clark* v. *Peabody Testing Service,* 265 Ark. 489, 579 S.W.2d 360 (1979). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Phillips* v. *State,* 271 Ark. 96, 607 S.W.2d 664 (1980). However, those standards must not totally insulate the Commission from judicial review and render this

118

court's function in these cases meaningless. *Boyd* v. *General Industries,* 22 Ark. App. 103, 733 S.W.2d 750 (1987). Before we will reverse a decision of the Commission, the court must be convinced that fair-minded persons with the same facts before them could not have arrived at the conclusion reached by the Commission. *International Paper Co.* v. *Tuberville,* 302 Ark. 22, 786 S.W.2d 830 (1990). When viewed in the light of the rules just stated and the law we have discussed, we do not think the Commission's decision is supported by substantial evidence.

The decision of the Commission is reversed and this matter is remanded for further proceedings consistent with this opinion.

CRACRAFT, C.J., and JENNINGS, J., agree.